(Reap. Dec. 11128)

FINE ARTS BAG CO. *v.* UNITED STATES

Entry No. 951473, etc.

(Decided February 3, 1966)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Glenn E. Harris* and *James S. O'Kelly,* trial attorneys), for the defendant.

OLIVER, Judge: These 16 appeals for reappraisement, consolidated for trial (R. 22), involve the importation of certain pearl and beaded handbags, exported from Japan between January and August 1961. The merchandise was entered at unit ex-factory prices exclusive of certain inland charges and buying commissions listed on the invoices. Appraisement was made on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at full f.o.b. cost, including therein, the inland charges and buying commissions.

The parties do not dispute the basis of appraisement, i.e., statutory export value, as defined, *supra*, but differ as to the proper total amounts of such statutory value. Plaintiff maintains: (1) that the merchandise was freely sold or offered for sale at the entered ex-factory prices and, therefore, the inland charges are not properly a part of the dutiable values; and (2) that said buying commissions were amounts paid to *bona fide* buying agents, and likewise, are nondutiable items. Defendant upholds the validity of the appraised values.

Upon the trial (R. 62–63), the parties limited the issues in this case to the following:

* * * that the appraiser computed * * * the appraised f.o.b. price as indicated in the red ink on the invoice, by taking the ex-factory unit values and adding to each of said ex-factory unit values the inland charges and alleged buying commission in the amounts as invoiced, to come up to his f.o.b. total.

  *   *   *   *   *   *   *

* * * that the issues herein are limited to the exclusion or inclusion in statutory export value of the said amounts of alleged buying commission and inland freight and other charges.

Section 402(b) of the Tariff Act of 1930, as amended, *supra*, provides as follows:

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The plaintiff introduced into evidence nine exhibits (plaintiff's exhibits 1 to 9) and the oral testimony of one witness. Defendant introduced into evidence five separate Treasury reports (defendant's exhibits A through E).

Mr. Dick Misserlian, called by the plaintiff and identified as a partner in the importer firm of Fine Arts Bag Co., testified in substance as follows: That, during the years 1960 and 1961, he was in charge of purchasing imported merchandise for his firm and in such capacity he traveled to Japan to obtain the involved handbags. Before traveling to Japan, he would customarily prepare and send ahead to companies he described as his buying agents sketches of the bags he wished to purchase while in Japan. When he arrived, the bags were usually near completion and most of the time he would go to his agent's office to discuss price (R. 38). However, on occasion, they would travel to the manufacturer's place of business. Since he

neither speaks nor understands Japanese, all negotiations were discussed with the agents. They would quote him the ex-factory prices and then inform him of the full f.o.b. costs. The difference in prices was 10 percent which included the buying commissions, usually 10 percent of the ex-factory price, and inland charges and costs for placing the merchandise on board the vessel, usually 2 or 3 percent (R. 39). Agents purchased only on instructions which specified purchases at ex-factory prices (R. 64).

On cross-examination, Mr. Missirlian testified that, aside from the items listed on the invoices, he never received a separate accounting from his agents for amounts spent on inland charges (R. 64).

Plaintiff's exhibit 1 is a buying agreement between Fine Arts Bag Co. and the Asiya Trading Co., dated July 2, 1957. It appoints Asiya as buying agent to visit manufacturers in Japan, to collect and submit samples, and to provide market reports and quote prices. Asiya was to purchase at ex-factory prices, inspect the merchandise, and arrange for shipment. Invoices were to show the ex-factory prices, plus all additional charges, including a buying commission of not less than 10 percent. The contract was to continue until 1 year after written notification of termination by either party. The agreement is on Fine Arts letter head and signed by Mr. Missirlian and, purportedly, by a representative of Asiya Trading Co.

Plaintiff's collective exhibit 2 consists of the following:

(1) A buying agreement, dated March 3, 1960, between Fine Arts and the Wako Trading Co., substantially the same as exhibit 1.

(2) An affidavit of M. Isonaga, manager of Wako Trading Co., Ltd., stating in substance that his company has acted as buying agent for Fine Arts since March 1960 and had negotiated with manufacturers for the account of Fine Arts. Further, that Wako does not manufacture itself and does not own or control any manufacturer that executes orders for Fine Arts, nor does it remit any part of its commission. It purchases at ex-factory prices and handles all shipping arrangements as agent for Fine Arts and never acted as seller to them.

(3) Affidavit of Mr. H. Kido stating that he is the proprietor of H. Kido & Co., a manufacturer of handbags. He does not ordinarily sell directly to American importers because of the language difficulties. During 1960, merchandise was sold to Fine Arts through Wako Trading Co., Ltd., on an ex-factory basis only. The purchasing agent took all responsibility for shipping the merchandise. Further, his company is an independent business organization, not owned or controlled by any purchasing agent, nor does it share its profits with or receive any commissions from any purchasing agent.

The rest of plaintiff's exhibits consists of various agency agreements (exhibit 3 between Fine Arts and Eisho Industrial Trading Co., Ltd.; exhibit 4 between Fine Arts and Osaka Trading Co., Ltd.; exhibit 5

between Fine Arts and Tsuyama Bag Co.) containing substantially the same arrangement as related in plaintiff's exhibit 1, and several sales notes and order confirmations between Fine Arts and its agents in Japan.

At the close of plaintiff's case, the Government introduced into evidence five Treasury reports all dated September 1962. Each report was made as a result of an investigation requested by the office of the Assistant Attorney General with respect to the appeals for reappraisement involved herein.

Exhibit A is the result of an interview between Customs Representative William G. Powell and Mr. Rokuro Inoue of Osaka Trading Co. and Mr. Maekawa, in charge of handbag exportation for Osaka and also employed by Hikami Shoten. The report contains the following information: Hikami Shoten is the manufacturer of handbags which are sold to the Osaka Trading Co., which in turn sells to Fine Arts; both Hikami Shoten and Osaka are jointly owned by the same family but are registered under separate names; there exist no written agreements on file between either Hikami Shoten or Osaka and Fine Arts; Fine Arts and all other American importers with whom they deal must purchase at f.o.b. prices, whether directly from Hikami Shoten or through Osaka; all transactions with United States importers are conducted and invoiced at f.o.b. values rather than broken down into separate ex-factory charges, except for Fine Arts, in which case, although they deal on an f.o.b. basis, they break down the totals and "manufacture" ex-factory prices; from the records of Osaka and Hikami Shoten respecting sales of handbags to Fine Arts, dated July and August 1961, there are listed several purchase orders and payments at f.o.b. prices; further, there are requests from Hikami Shoten, the manufacturer, to Osaka, the agent, for payment on these orders at the total f.o.b. charges.

Defendant's exhibit B resulted from an interview conducted by Powell with Mr. Hajimu Yomo of Eisho Industrial Trading Co., Ltd. The report relates another account of single family ownership of the Akashi Bag Co., the manufacturer of handbags, and the Eisho Co., the seller of such handbags. According to Mr. Yomo, whose mother owns the Akashi Bag Co., his company, Eisho, buys the handbags from Akashi and sells them at f.o.b. prices to Fine Arts. It appears that his company at times makes certain advances to Akashi in return for reduced ex-factory prices. He stated that no written agreements exist between Eisho and Fine Arts and that Akashi never sells at ex-factory prices to anyone but Eisho. Ownership of the goods transfers from Akashi to Eisho and then from Eisho to Fine Arts when placed on board the vessel. Further, it appears that payment in full f.o.b. costs is made by letter of credit addressed sometimes to Akashi and

sometimes to Eisho, but in either event payment is cashed by Yomo through a power of attorney from his mother.

Defendant's exhibit C, a report by Customs Representative Powell of an interview with Mr. Y. Kanki, manager of the Kamiyoshi Trading Co. and Mr. Kenzo Giri, representative of said company, tells another story of one company acting in a dual capacity. The report states in brief: Kamiyoshi Trading Co. is a shipping company that uses different names for different importers; in dealing with Fine Arts it uses the name Ashiya Trading Co.; Kamiyoshi Bag Co. is the manufacturer of the bags but all three companies are actually the same company; no record of inland charge payments are kept, such charges being estimates, and Fine Arts pays at full f.o.b. prices; the company, under any name, never sells at ex-factory prices since such prices, as shown on the invoices to Fine Arts, do not include any profit to Kamiyoshi; United States importers cannot buy from the manufacturer but must go through the shipping company; no record of payments from Ashiya to Kamiyoshi are kept since they are the same company and invoices are made out as requested by Fine Arts. Attached to this report is the buying agreement between Fine Arts and Ashiya (spelled Asiya) Trading Co., dated July 2, 1957, the same as plaintiff's exhibit 1.

Exhibit D, introduced by the Government, was the result of two interviews conducted by the Treasury agent in September 1962, one with Mr. Y. Kabasawa, formerly of Kabasawa Shokai, and the other with Mr. Susumu Shibano, managing director of Daigo Boeki, a trading company in Kobe, Japan. This report reveals a rather involved story, the essence of which appears to be the following: Until October of 1961, Mr. Kabasawa ran an individual proprietorship for the manufacture of beaded bags known as Kabasawa Shokai; he sold his merchandise directly to Daigo Boeki of Kobe, Japan; there was no financial interest between himself or Daigo Boeki or Fine Arts; the price to Daigo Boeki included export packing and inland freight from his factory to Daigo's Kobe godown; the ownership of the merchandise passed to Daigo Boeki when delivery was made to Daigo's Kobe warehouse; the merchandise thus manufactured by Kabasawa Shokai, and ultimately destined for Fine Arts, was sold and shipped under the name Tsuyama Bag Co., the name of a bag manufacturer which was appropriated and used by Daigo Boeki until October 1961. Mr. Shibano stated that, while Fine Arts thought they were dealing with Tsuyama Bag Co., they were actually doing business with Daigo Boeki; letters of credit for the full f.o.b. price, made out by Fine Arts to Tsuyama Bag Co., were actually cashed by Daigo. Mr. Shibano further stated that the inland charges on the invoices were fictitious and that a 15 percent buying commission, included thereon, covered their profit and about 4 percent shipping charges; Daigo

Boeki sold the bags to Fine Arts after buying them from Kabasawa Shokai.

Finally, defendant's exhibit E is a report of an investigation conducted into the Kido & Co. manufacturing firm and the Wako Trading Co. In this report, Mr. Kido of Kido & Co. gives information in complete contradiction to that contained in plaintiff's exhibit 2 and flatly states that he does not and would not sell to United States importers directly but only through Wako Trading Co. Further, that he sells his merchandise to the Wako Co. and includes therein inland charges from his factory to Wako's Kobe godown. Mr. Kawajiri, president of Wako Trading Co., corroborates this relationship and states that his company sells to Fine Arts as owner of the merchandise at f.o.b. prices only.

The evidence presented in this case has been outlined at length because the only real dispute between the parties amounts to these two contradictory versions of what the actual facts are in determining the proper export value. The issues have been narrowly drawn and the law is clear with respect to those issues, namely, (1) *bona fide* commissions paid to purchasing agents for services rendered in purchasing the merchandise form no part of the export value, *United States* v. *Alfred Kohlberg, Inc.*, 27 CCPA 223, C.A.D. 88; *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145, and (2) that inland charges incurred in the country of export are ordinarily not includible in export value, *Valley Knitting Co., Inc., et al.* v. *United States*, 44 Cust. Ct. 599, Reap. Dec. 9627; *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71.

However, such charges are includible in the determination of export value where it is shown that the merchandise is not freely offered at ex-factory prices but only at prices which include the buying commissions and inland charges, *Albert Mottola et al.* v. *United States*, 46 CCPA 17, C.A.D. 689. It was held in that case, with respect to inland charges, that the significant fact was that purchasers could not buy and manufacturers would not sell at a price which did not include the shipping charges from factory to port of exportation. The same has been held true where buying commissions were concerned, *Mottola, supra*, and the *bona fides* of such commissions are to be determined by the facts in each case, *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590. In the *Nelson Bead* case, it was important to determine whether the manufacturers recognized the agents as representatives of the purchaser and whether or not such agents were retained *directly* or *indirectly* by the manufacturers.

In the instant situation, we are confronted by two conflicting sets of buyer-seller relationships. The plaintiff's evidence tends to indicate an export market wherein importers are free to buy merchandise at the ex-factory prices but choose instead to set up *bona fide* buying agents to handle all transactions incurred subsequent to sale. On the

other hand, defendant's evidence indicates, in some instances, complete identity between manufacturer and the alleged buying agent, and, in other instances, outright sales from manufacturers to independent trading companies, together with the "manufacturing" of fictitious ex-factory prices; but in every instance, the nonexistence of freely offered ex-factory prices, available to any purchaser for the asking.

Plaintiff argues that sworn testimony, both oral and in affidavit form, should be given greater weight than the unsworn, largely hearsay statements of the Treasury reports. Courts have on occasion taken this view. (*Berben Corporation* v. *United States*, 45 Cust. Ct. 482, Reap. Dec. 9785, reversed on other grounds, 49 Cust. Ct. 497, A.R.D. 147.) However, Congress has seen fit to make such unsworn, hearsay-type reports admissible in evidence in all reappraisement cases (28 U.S.C., section 2633). Moreover, they have been likened to facts learned in the course of business or employment. *Cf. United States* v. *American Express Co.*, 44 Cust. Ct. 779, A.R.D. 120. While in some cases the content of a report, as well as other circumstances existing in a record, may cause a court to afford them little weight, the circumstances existing in this case, as well as the nature of the reports themselves, afford no such inclination. To give the reports no weight at all because unsworn and of a hearsay nature would frustrate the intent of Congress. To give them any weight, because of their relevant and detailed accounts, produces diametrically opposed pictures of the Japanese export market for the involved merchandise. The record as a whole does not resolve the conflict and the court need not. It is sufficient to say that plaintiff's evidence has been effectively countered and its burden of proof not sustained. *Cf. The Heyman Co.* v. *United States*, 39 Cust. Ct. 707, Reap. Dec. 9033.

Therefore, I find as facts:

1. That the merchandise herein consists of pearl and beaded handbags, exported from Japan during the period from January 1961 to August 1961.

2. That the merchandise was entered at the invoiced ex-factory prices, exclusive of inland charges and buying commissions itemized on said invoice.

3. That the merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at invoiced unit values, net packed, plus items on the invoice for inland charges and buying commissions or, in effect, f.o.b. port of exportation prices.

4. That the record herein does not establish that, on or about the dates of exportation, such or similar merchandise was freely sold or offered for sale in the principal markets of Japan, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at the entered, ex-factory prices.

I find as law:

1. Export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the values of the involved merchandise.

2. That plaintiff has failed to overcome the presumption of correctness attaching to the action of the appraiser.

3. That the dutiable values in each instance are the appraised values.

Judgment will be rendered accordingly.